**NATIONAL LEAD and ZINC COMPANY and Hartford Accident and Indemnity Company, Petitioners,**

**v.**

**Muriel A. HIGHTOWER and the State Industrial Commission, Respondents.**

**No. 37236.**

Supreme Court of Oklahoma.

Oct. 16, 1956.

Covington & Donovan, Tulsa, for petitioners.

Howard C. Triggs, Oklahoma City, Mac Q. Williamson, Atty. Gen., for respondents.

CORN, Justice.

In this case it appears that on the 30th day of November, 1952, Lewis W. Hightower, while in the employ of National Lead and Zinc Company, sustained an accidental injury consisting of an injury to his lungs from which he died on May 5, 1953. The injury was caused by the inhalation of Chlorine gas fumes.

On August 14, 1953, Muriel A. Hightower, surviving widow and sole dependent heir of deceased filed a claim for compensation under the Death Benefit Provision of the Workmen's Compensation Act against National Lead and Zinc Company, employer of deceased, and its insurance carrier, hereinafter referred to as petitioners wherein she states substantially the above state of facts.

The trial commissioner to whom the case was assigned found the issues in favor of respondent and under order entered June 29, 1955, awarded her compensation in the sum of $13,500. The award was thereafter, and on July 18, 1955, vacated and set aside by a different trial commissioner and the case was retained for further hearing.

On October 12, 1955, the case came on to be heard further before a trial commissioner who at the close of the evidence found that on November 30, 1952, Lewis W. Hightower, deceased, was in the employ of petitioner herein, National Lead and Zinc Company and on said date sustained an accidental injury arising out of and in the course of his employment, by inhalation of Chlorine gas fumes resulting in his death on May 5, 1953; that said Lewis W. Hightower, deceased, left surviving him as his sole dependent heir his widow, Muriel A. Hightower, who is entitled to the sum of $13,500 for the accidental injury resulting in the death of said Lewis W. Hightower and upon such finding entered an order awarding her compensation accordingly which was sustained on appeal to the Commission en banc.

Petitioners bring the case here to review this award and contend that the evidence is insufficient to support an award for an accidental injury; that the evidence discloses deceased's death was due to occupational disease rather than to an accidental injury.

Respondent, in her own behalf in substance, testified that she is the surviving widow and sole dependent heir of deceased; that they lived together as husband and wife for thirty years. There were no children born of their marriage, nor did deceased have any children of a former marriage; that her husband was placed in the hospital on November 30, 1952, after exposure to chlorine gas. At the time he had the exposure he was in the employ of National Lead and Zinc Company. After this exposure he was hospitalized for several days after which he returned to work and continued working for about a month, at which time he became ill and consulted with Dr. B his family physician. Deceased had several prior exposures to chlorine gas, one in December 1949, and one between 1949 and 1952, but she did not remember the exact date. Deceased, however, had completely recovered from such exposures and again returned to work and remained at work without any difficulty until November 30, 1952, when he suffered his last exposure.

Jack Lar Zelere, who was night supervisor, testified that he had been called by one of the other employees and found deceased sitting on a bench outside the main door of the acid plant around 2:00 or 3:00 o'clock in the morning of November 30th. Deceased was coughing and informed him he thought he had been exposed to chlorine.

The superintendent took him to a hospital and called the company doctor. About thirty minutes later he returned to the plant to determine whether or not there was a chlorine leak at the location suggested by deceased. He had previously instructed one of the other employees to check and if there was a leak to repair it. He further testified that Mr. Cox reported that he had repaired a valve on the chlorine tank, if there was any escaping gas it was no longer escaping. He testified there was no evidence of chlorine in the room, but that the windows were all open, as they normally were kept open in that room.

It was stipulated that if Pete Cox were called to testify he would testify that in response to an order from the night foreman, he had checked the number two valve on the number two tank where deceased had been working with instructions to tighten it to prevent any possible leaks, and that he made the ammonia hydroxide test at the fitting. There was some evidence which indicated to him the presence of chloride gas and he made the necessary adjustments to tighten the valve; that he could not detect chlorine gas itself by odor when he came into the room but since the candle test indicated the presence of gas near the valve he carried out the instructions of the supervisor and tightened the valve.

The medical evidence consists of evidence of three physicians. Dr. B, in substance, testified he had been the family physician of deceased. He treated deceased on different occasions for various complaints during his lifetime. He first saw and treated him for his injury alleged to have been sustained on November 30, 1952, in the latter part of December 1952. He was at that time complaining of some respiratory troubles. X-ray films were made by another doctor. The films disclosed that deceased was suffering from a tumerous growth in the left lung and following this information deceased was referred to a chest specialist at Tulsa. The specialist made several examinations and tests and following these examinations and tests deceased was operated and his left lung was removed. The right lung appeared to be normal. An examination of the lung which was removed disclosed the correctness of the X-ray diagnosis.

Deceased remained in the hospital after his operation for about four weeks when he returned to Dr. B at Bartlesville for observation and treatment. Deceased shortly thereafter had a relapse and was returned to the hospital at Tulsa where he remained until the latter part of April 1953, when he was again returned to Dr. B at Bartlesville and was placed in a hospital there, where he died on May 5, 1953. The doctor further testified in answer to a hypothetical question propounded by counsel, based on the evidence introduced, which included the evidence of respondent, as to the inhalation by deceased of chlorine gas, stated that in his opinion deceased's death was due and caused by the inhalation of the chlorine gas fumes.

Dr. A testified that he first saw and examined deceased on February 2, 1953, at which time he had been entered in a hospital at Tulsa. The patient was referred to him by Dr. B at Bartlesville who had been treating him. He obtained a history from the patient of having inhaled chlorine gas on November 30, 1952, while working for National Lead and Zinc Company. He was then complaining of pain in his chest, soreness in his lung, shortness of breath and was coughing considerably. The patient also gave a history of having prior exposures to chlorine gas fumes as above stated. The exposure of November 30, 1952, however, was more severe than the other exposures. The second day after deceased entered the hospital subsequent to his November 30, 1952, exposure the doctor gave him a thorough examination. The examination consisted of a broncho scopic examination. It disclosed that the patient had changes involving the upper lobe branch of the air passage leading to the upper lobe of the left lung. At the time of the examination there were pieces of tissue removed from the tissue of the lung and these were examined and found to

contain cancerous cells. The next step was to operate and remove the tumor. Deceased was operated on February 5, 1953, and the left lung was removed. The removed lung showing a partial collapse of the upper lobe with a tumor in the air passage leading to the upper portion of the lung. The right lung was free from tumor but did not appear to function properly after the removal of the left lung. The tumor found to exist in the left lung in the opinion of the doctor might have been caused by the inhalation of chlorine gas. In the doctor's opinion, however, deceased's immediate death was not caused by the inhalation of the gas fumes but was due to heart failure. The cause of the heart failure was due to decreased pulmonary insufficiency caused by the fact that after the removal of the left lung greater stress was placed on the right lung and upon the heart and was the underlying cause of his heart failure. The doctor further testified:

"Q. Doctor, on the basis of the history which you received, and on the basis of your own observation, is there any other possible cause for the emphysema and fibrosis which you saw in the right lung other than the exposure to the gas? A. On the basis of the history given in this particular case, there is not.

"Q. Doctor, what is the effect if any on the lungs of exposure to chlorine gas? A. It causes a severe inflammation and irritation of the trachea bronchial tree.

"Q. What symptomatology ordinarily follows from such inflammation, Doctor? A. Very similar to that of any acute inflammation, such as pneumonia, shortness of breath, fever, cough, pain in the chest.

"Q. How much chlorine gas is necessary to bring about fibrosis and emphysema of the type you saw in the right lung and in the lower half of the left lung by means of your x-ray? A. I can state that a very small amount of chlorine can cause a great deal of damage to the lung, even though the exposure is for a very short length of time."

Another doctor testified that deceased's death was not caused by the inhalation of chlorine gas fumes but was due to other causes.

Petitioners contend that the above evidence offered by respondent establishes that deceased's death was due to an occupational disease rather than to accidental injury, and since deceased acquired such disease and expired from it prior to the passage and effective date of the Occupational Disease Act of 1953, S.L.1953, page 427, 85 O.S.Supp. § 1.1 et seq., his dependents may not recover compensation because of his death.

We do not agree that the evidence above detailed clearly shows that deceased's death was caused from an occupational disease rather than from accidental injury. We have heretofore said that an "accident" as contemplated by the Workmen's Compensation Law, 85 O.S.1951 § 1 et seq., is distinguished from an occupational disease in that it arises by some definite event the date of which can be fixed with certainty, but which cannot be so fixed in the case of occupational diseases. Eagle-Picher Mining and Smelting Co. v. Loyd, 192 Okl. 554, 138 P.2d 536; Johnson Oil Refining Co. v. Guthrie, 167 Okl. 83, 27 P.2d 814, 90 A.L.R. 616.

The evidence offered in behalf of respondent in our opinion definitely fixes November 30, 1952, as the date on which deceased received the gas exposure which resulted in his death. While the evidence discloses that he had suffered several prior exposures to chlorine gas they were not so severe as the November 30, 1952 exposure. The evidence discloses that deceased had completely recovered from his prior exposures and was able to return to work and continue to work subsequent to the prior exposures without material difficulty until he sustained his last exposure November 30, 1952. In this respect Dr. A. testified:

"Q. It is your opinion, Doctor, that this condition resulted solely from his exposure on November 30, 1952? A. Do you mean—

"Q. (Interposing) That fibrosis and emphysema were the result of that exposure to the chlorine gas on that date. A. I cannot say that it was solely due to that, no.

"Q. Well, what else was it due to? A. I can say this,—that according to the x-ray evidence the changes that occurred, occurred within a month following that exposure.

"Q. Then wouldn't it be fair to say that there were no evidences of any previous damage? A. As far as we can see, there was no evidence of previous damage, no history of any lung disease other than exposure.

"Q. No evidence of any damage by exposure to chlorine prior to this one of November 30, 1952? A. As far as we can tell, yet."

█ While there is some medical evidence to the effect that deceased's death was not caused from inhalation of gas fumes, but that his death was due to other causes there is also evidence to the contrary. The Commission found that on November 30, 1952, deceased, while in the employ of his employer, sustained an accidental injury consisting of the inhalation of gas fumes resulting in his death. Since there is competent evidence to sustain this finding it will not be disturbed on review. In Bishop's Restaurant, Inc. v. McKim, 208 Okl. 631, 258 P.2d 170, 172, we held:

"Whether a disability is attributable to an injury or other cause is a question of fact to be determined by the State Industrial Commission from the competent evidence adduced. Its determination of this fact will not be disturbed where reasonably supported by medical testimony."

See, also, National Zinc Co., Inc., v. Seabolt, Okl., 282 P.2d 745.

Award sustained.

JOHNSON, C. J., WILLIAMS, V. C. J., and WELCH, DAVISON, BLACKBIRD, JACKSON and CARLILE, JJ., concur.

HALLEY, J., dissents.